# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

RONALD KAREEM SEABROOKS,

Defendant-Appellant.

UNPUBLISHED
November 24, 2015

No. 320320
Wayne Circuit Court
LC No. 13-007631-FC

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DEMAR ANTHONY PAYNE,

Defendant-Appellant.

No. 320327
Wayne Circuit Court
LC No. 13-006269-FC

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

KEITH ANTHONY WILLIAMS,

Defendant-Appellant.

No. 320406
Wayne Circuit Court
LC No. 13-006272-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JASON LAMAR MILLER,

        Defendant-Appellant.

No. 320502
Wayne Circuit Court
LC No. 12-007613-FC

Before: HOEKSTRA, P.J., and JANSEN and METER, JJ.

PER CURIAM.

In Docket No. 320320, defendant Ronald Kareem Seabrooks challenges his jury-trial convictions of: (a) first-degree premeditated murder, MCL 750.316(1)(a); (b) felony murder, MCL 316(1)(b); (c) assault with intent to commit murder (AWIM), MCL 750.83; (d) three counts of torture, MCL 750.85(1); (e) three counts of unlawful imprisonment, MCL 750.349b(1); (f) two counts of mutilation of a dead body, MCL 750.160; and (g) possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Seabrooks was sentenced to life in prison for the murder convictions, 20 to 40 years' imprisonment for the AWIM conviction, 20 to 40 years' imprisonment for each torture conviction, seven to 15 years' imprisonment for each conviction of unlawful imprisonment, five to 10 years' imprisonment for each conviction of mutilation of a dead body, and two years' imprisonment for the felony-firearm conviction. We affirm.

In Docket No. 320327, defendant Demar Anthony Payne challenges his jury-trial convictions of: (a) second-degree murder, MCL 750.317; (b) first-degree premeditated murder, MCL 750.316(1)(a); (c) two counts of felony murder, MCL 750.316(1)(b); (d) AWIM, MCL 750.83; (e) three counts of torture, MCL 750.85(1); (f) three counts of unlawful imprisonment, MCL 750.349b(1); (g) two counts of mutilation of a dead body, MCL 750.160; and (h) felony-firearm, MCL 750.227b. Payne was sentenced to 25 to 50 years' imprisonment for the second-degree murder conviction, life in prison for the remaining murder convictions, 25 to 50 years' imprisonment for the AWIM conviction, 20 to 40 years' imprisonment for each conviction of torture, seven to 15 years' imprisonment for each of the unlawful imprisonment convictions, five to 10 years' imprisonment for each conviction of mutilation of a dead body, and two years' imprisonment for felony-firearm. We affirm in part, vacate in part, and remand to the trial court for amendment of the judgment of sentence.

In Docket No. 320406, defendant Keith Anthony Williams appeals his jury-trial convictions of: (a) first-degree premeditated murder, MCL 750.316(1)(a); (b) second-degree murder, MCL 750.317; (c) two counts of felony murder, MCL 750.316(1)(b); (d) AWIM, MCL 750.83; (e) three counts of torture, MCL 750.85(1); (f) three counts of unlawful imprisonment, MCL 750.349b(1); (g) two counts of mutilation of a dead body, MCL 750.160; (h) felon in possession of a firearm, MCL 750.224f; and (i) felony-firearm, MCL 750.227b. Williams was

sentenced to life in prison for the first-degree murder convictions, 40 to 80 years' imprisonment for the second-degree murder conviction and for the AWIM conviction, 20 to 40 years' imprisonment for each conviction of torture, seven to 15 years' imprisonment for each unlawful imprisonment conviction, five to 10 years' imprisonment for each conviction of mutilation of a dead body, two to five years' imprisonment for the felon-in-possession conviction, and two years' imprisonment for the felony-firearm conviction. We affirm in part, vacate in part, and remand to the trial court for amendment of the judgment of sentence.

In Docket No. 320502, defendant Jason Lamar Miller appeals his bench-trial convictions of: (a) two counts of second-degree murder, MCL 750.317; (b) felony murder, MCL 750.316(1)(b); (c) three counts of torture, MCL 750.85; (d) three counts of unlawful imprisonment, MCL 750.349b(1); (e) two counts of mutilation of a dead body, MCL 750.160; (f) felon in possession of a firearm, MCL 750.224f; and (g) felony-firearm, MCL 750.227b. Miller was sentenced to life imprisonment for the felony murder conviction, 30 to 60 years' imprisonment for each second-degree murder conviction, 20 to 40 years' imprisonment for each conviction of torture, seven to 15 years' imprisonment for each unlawful imprisonment conviction, five to 10 years' imprisonment for each conviction of mutilation of a dead body, two to five years' imprisonment for the felon-in-possession conviction, and two years' imprisonment for the felony-firearm conviction. We affirm in part, vacate in part, and remand to the trial court for amendment of the judgment of sentence.

These appeals arise from a double homicide tied to events occurring on April 29, 2012, at 15324 Cruse St. in Detroit. The murder victims were identified as Michael Bostick and Kyra Jordan. Michael Bostick died as a result of two gunshot wounds. One bullet was recovered from Jordan's body. The bodies of both victims were burned post-mortem, resulting in such substantial charring that Bostick incurred an amputation of his lower extremities attributed to thermal injury. The use of dental records was necessary to substantiate Jordan's identification by the medical examiner. A third victim, Lester Lewis, incurred a gunshot wound to the face, but was able to escape while being transported in the trunk of the vehicle that was later used to immolate the other two victims.

## I. DUE DILIGENCE

Seabrooks, Williams and Payne contend on appeal that the prosecutor failed to show due diligence in seeking to procure the presence of witness Michael Eatmon for trial. They further assert error in the trial court's denial of their request for a missing witness instruction. For the first time on appeal, Miller asserts error in the trial court's failure to grant an adjournment of the trial to permit time to locate Eatmon to testify.

A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *People v Briseno*, 211 Mich App 11, 14; 535 NW2d 559 (1995). A trial court's denial of a request for a missing witness instruction is also reviewed for an abuse of discretion. *People v Snider*, 239 Mich App 393, 422; 608 NW2d 502 (2000). Whether due diligence was exercised by a prosecutor in trying to secure a witness to testify involves a finding of fact that will not be set aside absent clear error. *Briseno*, 211 Mich App at 14. A finding is deemed to be clearly erroneous if it leaves this Court with a "definite and firm conviction that a mistake has been made." *People v McSwain*, 259 Mich App 654, 682; 676 NW2d 236 (2003) (citation and

quotation marks omitted). "Reversal for failure to provide a jury instruction is unwarranted unless it appears that it is more probable than not that the error was outcome determinative." *People v McKinney*, 258 Mich App 157, 163; 670 NW2d 254 (2003).

To properly preserve an issue regarding the denial of an adjournment, a defendant must actually request an adjournment or continuance. See *Snider*, 239 Mich App at 421. "This Court reviews the grant or denial of an adjournment for an abuse of discretion." *Id.* "A trial court abuses its discretion when it chooses an outcome that is outside the range of reasonable and principled outcomes." *People v Orr*, 275 Mich App 587, 588-589; 739 NW2d 385 (2007). A denial of a request for an adjournment or continuance is not a ground for reversal unless the defendant demonstrates that prejudice resulted from the court's abuse of discretion with respect to the motion. *Snider*, 239 Mich App at 421-422. Because this issue was not raised in the trial court it is unpreserved and reviewed for plain error affecting a defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

The witness list for the prosecution listed Michael Eatmon as a trial witness. At the close of the prosecution's case, it was acknowledged that Eatmon could not be located for trial. Consequently, a due diligence hearing was conducted with Detroit Police Sergeant William Hart to ascertain the efforts undertaken to secure Eatmon's presence for trial. Hart indicated that he ran a Law Enforcement Information Network (LEIN) query to obtain addresses for Eatmon and discovered that he was "still a probation violator." In addition to speaking with Eatmon's probation officer, Hart had all of the addresses obtained for Eatmon checked without success and, on development of a new address, that location was also reviewed. Hart ran a check through "Vine Link" to determine if Eatmon had been arrested, but it was negative. An individual confirmed that Eatmon was no longer at one of the addresses developed. Hart further checked all the morgues and hospitals, along with CRISNET, trying to locate Eatmon. All efforts were without success. Hart testified that he was searching for Eatmon before trial started, but halted efforts when it became uncertain whether Eatmon would also be charged and following Payne's initial acceptance of a plea agreement. When Payne withdrew his plea and defense counsel indicated they wanted Eatmon for trial, Hart asserted, he revamped his efforts to locate Eatmon. At the conclusion of Hart's testimony, the trial court found "there's good cause to excuse [Eatmon]."

Defense counsel requested a special instruction based on Eatmon's absence at trial and the trial court again conducted a due diligence hearing with Hart to update and verify the efforts to produce the witness. Hart indicated, at the beginning of trial, that he attempted to contact Eatmon through a telephone number and by securing an address through the Secretary of State. Neither effort was successful. Hart obtained and checked a number of addresses for Eatmon without locating him. He contacted his probation officer, who had Eatmon listed as an "absconder," and requested that the probation officer contact Hart if the Probation Department was notified that Eatmon was apprehended. Hart and members of his staff checked addresses as developed and continued to try to generate new leads to his location. Vine Link was again used to determine if Eatmon was arrested and in jail. Hart asserted that any aliases used by Eatmon would have arisen in conjunction with the check on this system under Eatmon's actual name. All hospitals and morgues were contacted and efforts were made to determine if Eatmon was receiving any form of public assistance. At one of the addresses identified, a jail bracelet for Eatmon was located underneath a mattress, but Eatmon was no longer at that location. Efforts

-4-

were also made to find and communicate with Eatmon's girlfriend, but she could not be located. At one house investigated, a woman identifying herself as Eatmon's mother was uncooperative and reported that she had not seen or spoken to Eatmon for a period of time. No surveillance was performed on the mother's residence during the trial. Hart did not investigate jail or prison facilities in West Virginia. He also confirmed that he did not employ the Fugitive Apprehension Team in trying to locate Eatmon. Hart verified that the Wayne County jails were checked at the beginning of trial and again during the week of December 16, 2013, while trial was in progress. It was learned that Eatmon was in the Wayne County Jail from May 20, 2013, to June 28, 2013, but was no longer in their custody. The trial court denied the request for a missing witness instruction based on its finding of due diligence by the prosecutor.

In accordance with MCL 767.40a(1), a prosecutor "shall attach to the filed information a list of all witnesses known to the prosecuting attorney who might be called at trial and all res gestae witnesses known to the prosecuting attorney or investigating law enforcement officers." "Not less than 30 days before the trial, the prosecuting attorney shall send to the defendant or his or her attorney a list of the witnesses the prosecuting attorney intends to produce at trial." MCL 767.40a(3). A prosecutor's obligations to assist a defendant in securing witnesses are delineated in MCL 767.40a(5). A prosecutor is only required to "notify a defendant of all known res gestae witnesses and all witnesses that the prosecution intends to produce" at trial. *People v Cook*, 266 Mich App 290, 295; 702 NW2d 613 (2005) (emphasis removed). There is no requirement that a prosecutor must locate, endorse, and produce every res gestae witness. See *id*. "The prosecutor's duty to produce witnesses has been replaced with an obligation to provide notice of known witnesses and reasonable assistance to locate witnesses on defendant's request." *Id*. (citation and quotation marks omitted; emphasis removed). "A prosecutor who endorses a witness under MCL 767.40a(3) is obliged to exercise due diligence to produce that witness at trial." *People v Eccles*, 260 Mich App 379, 388; 677 NW2d 76 (2004). Due diligence is demonstrated when a prosecutor attempts "to do everything reasonable, not everything possible," to produce a witness at trial. *Id*. at 391. If the prosecutor does not exercise due diligence and is unable to produce an endorsed witness, or fails to provide reasonable assistance to locate and serve process upon a witness at a defendant's request, a missing witness instruction may be appropriate. See *People v Perez*, 469 Mich 415, 420; 670 NW2d 655 (2003). The missing witness instruction provides the jury with the option "that it may infer that the missing witness's testimony would have been unfavorable to the prosecution's case." *Eccles*, 260 Mich App at 388.

In support of their position, defendants reference *People v Dye*, 431 Mich 58; 427 NW2d 501 (1988), to suggest that the prosecution's alleged failure to attempt to locate Eatmon until trial began demonstrates a lack of due diligence. The *Dye* Court found, in that case, that the prosecution failed to establish due diligence because the efforts to find important witnesses were "tardy and incomplete." *Id*. at 67-68. In *Dye*, although the prosecution was aware of the potential for the witnesses to leave the state and not accept service for months before the trial began, the prosecution failed to investigate the location of the witnesses until shortly before trial and failed to pursue information regarding the location of the witnesses. *Id*. at 67-73. The circumstances of these cases are distinguishable. First, there is no evidence to suggest that Hart and his staff neglected to follow or investigate any leads with regard to locating Eatmon. Rather, the evidence shows that numerous addresses were identified and investigated, individuals were interviewed, and contact with his probation officer and electronic sources were used in an

attempt to find Eatmon for trial. Second, Hart testified, without contradiction, that his efforts to establish addresses and locate Eatmon began before trial and continued when it was determined that defense counsel wanted Eatmon as a witness. Third, there is no indication that the prosecution was aware that Eatmon would become unavailable based on his provision of a voluntary statement to the police and his appearance at prior scheduled court dates without the necessity of police intervention or assistance. Based on the record, there was no abuse of discretion in the determination that the prosecution had exercised due diligence and the refusal to provide the missing witness instruction. *Eccles*, 260 Mich App at 389.

With regard to the contention that an adjournment should have been granted due to the inability to procure Eatmon, that aspect of the issue is unpreserved because an adjournment was not requested. In addition, there is no argument or legal citation presented on appeal to explain how an adjournment would have altered the result or outcome of trial. The failure to argue this point and cite to relevant legal authority results in an abandonment of this aspect of the issue on appeal. See *People v Payne*, 285 Mich App 181, 195; 774 NW2d 714 (2009) (citation and quotation marks omitted) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority."); see also *People v Ackerman*, 257 Mich App 434, 450; 669 NW2d 818 (2003) ("the failure to cite any supporting legal authority constitutes abandonment of an issue").

There is also an attempt to characterize this issue as constitutional in nature by defendants' assertion that they were denied their right to due process, to confront witnesses and to present a defense premised on the prosecution's failure to present Eatmon as a witness at trial. "The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' " *Crawford v Washington*, 541 US 36, 42; 124 S Ct 1354; 158 L Ed 2d 177 (2004), quoting US Const, Am VI. Testimonial statements of a witness who does not appear at trial are only admissible if the defendant had a prior opportunity for cross-examination and the witness was unavailable to testify. *Crawford*, 541 US at 68. For purposes of the Confrontation Clause a witness is deemed to be unavailable if he or she is absent and the prosecutor made a good faith effort to obtain that individual's presence for trial. *Barber v Page*, 390 US 719, 724-725; 88 S Ct 1318; 20 L Ed 2d 255 (1968), overruled on other grounds by *Crawford, supra*. Hence, the unavailability of a witness is not dependent on the intent of the witness but rather on the efforts expended by the prosecution. As discussed *supra*, the trial court did not abuse its discretion in finding that the prosecution demonstrated due diligence in trying to secure Eatmon for trial.

Testimony was elicited from Eatmon under an investigative subpoena where cross-examination was not available. This testimony was not introduced at trial for Seabrooks, Williams and Payne. However, they suggest that had Eatmon been available at trial his testimony would have, in some manner, served to exculpate them of the charges. Even if Eatmon's testimony under the subpoena were considered, it was not exculpatory. Eatmon acknowledged being present at the Cruse residence and observing all of the defendants with guns, except for Miller. (Eatmon, however, asserted that he did not remain in the home for the entirety of the events.) His testimony confirmed the presence of defendants, the presence of at least four weapons (two revolvers and two assault rifles), the removal of the victims to the basement and shots being fired. Eatmon's testimony was not exculpatory with regard to

Williams, Seabrooks or Payne.  In terms of Miller, although Eatmon did not initially place a gun in his hands, Miller ignores that the prosecution's theory was one of aiding and abetting.

"Unlike conspiracy and felony murder, which also allow the state to punish a person for the acts of another, aiding and abetting is not a separate substantive offense.  Rather, 'being an aider and abettor is simply a theory of prosecution' that permits the imposition of vicarious liability for accomplices." *People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006) (citations omitted).  The elements necessary for a conviction under an aiding and abetting theory are:

"(1) the crime charged was committed by the defendant or some other person;  (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement." [*Id*. (citations omitted).]

Hence,

[a] defendant is criminally liable for the offenses the defendant specifically intends to aid or abet, or has knowledge of, as well as those crimes that are the natural and probable consequences of the offense he intends to aid or abet. Therefore, the prosecutor must prove beyond a reasonable doubt that the defendant aided or abetted the commission of an offense and that the defendant intended to aid the charged offense, knew the principal intended to commit the charged offense, or, alternatively, that the charged offense was a natural and probable consequence of the commission of the intended offense. [*Id.* at 15.]

The mere fact that Eatmon did not place a "smoking gun" in Miller's hands during the short time Eatmon claimed to have been present is not enough to exculpate Miller based on both the testimony elicited from Lester Lewis and Terrance Griggs under an aiding and abetting theory, particularly given Eatmon's absence during both the initial and conclusory events that comprised the charges.  In addition, Miller's contention that the failure to present Eatmon compromised his ability to present a defense is without merit because defense counsel and the prosecutor stipulated to permit admission of Eatmon's investigative subpoena testimony into evidence during Miller's bench trial.

Further, the suggestion that Eatmon's testimony would have further challenged the credibility of the prosecution's testifying witnesses is simply speculative as well as being more hopeful than rational, given Eatmon's indication that the victims were on the floor of the home surrounded by at least four armed individuals and forced to the basement of the home and that gunshots were fired.  In other words, Eatmon's testimony under the investigative subpoena was sufficiently similar to that of Lewis and Griggs on the major elements of the crimes charged to render discrepancies on less consequential details irrelevant.

## II.  ADMISSIBILITY OF EVIDENCE

Seabrooks contends the trial court erred in not permitting him to testify regarding a statement made by Lewis to Seabrooks when they were both in West Virginia after the events had transpired.  Specifically, Seabrooks asserts error in the trial court's sustaining the hearsay

objection by the prosecutor to Seabrooks's testimony that Lewis indicated his facial injury was the result of "a mistake." Defense counsel asserted the testimony was admissible as a prior inconsistent statement and that by precluding it the trial court was denying Seabrooks his right to present a defense. It is further alleged that the trial court erred in sustaining the prosecution's objection to defense counsel's inquiry of Seabrooks whether Lewis acknowledged that his facial injury did not involve Seabrooks's shooting of Lewis. (Seabrooks was permitted to testify, in general, that Lewis's response to an inquiry regarding his facial injury did not suggest or reference being shot by Williams.) It is argued that the trial court further erred in sustaining the prosecution's objection to a query placed to Seabrooks regarding whether Lewis ever attacked him and accused him of trying to kill him when they encountered each other in West Virginia.

"The decision whether to admit evidence falls within a trial court's discretion and will be reversed only when there is an abuse of that discretion," which occurs when the court's decision "falls outside the range of reasonable and principled outcomes." *People v Duncan*, 494 Mich 713, 722-723; 835 NW2d 399 (2013). This Court reviews de novo "[p]reliminary issues of law, including the interpretation of the rules of evidence and the effect of constitutional provisions . . . ." *People v Benton*, 294 Mich App 191, 195; 817 NW2d 599 (2011).

In general, all relevant evidence is admissible, and irrelevant evidence is inadmissible. MRE 402. Evidence is deemed to be relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401; see also *People v Watkins*, 491 Mich 450, 470; 818 NW2d 296 (2012). Even if determined to be relevant, evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. "All evidence offered by the parties is 'prejudicial' to some extent, but the fear of prejudice does not generally render the evidence inadmissible. It is only when the probative value is substantially outweighed by the danger of unfair prejudice that evidence is excluded." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995) (emphasis removed).

Seabrooks contends the trial court erred in sustaining the prosecutor's hearsay objection during the following query of Seabrooks:

> *Q*. Tell me this. When you saw Lester Lewis at the community college, did he attack you?
>
> *A*. No.
>
> *Q*. Did he say, you tried to kill me?

At this point the prosecutor objected based on hearsay, and the trial court sustained the objection. Defense counsel did not contest the objection or ruling and was able to elicit testimony from Seabrooks indicating that he was given no indication that Lewis, while both men were in West Virginia, behaved in a manner to suggest he was fearful of Seabrooks or resentful of his participation in the events on Cruse Street.

The general rule is that "prior unsworn statements of a witness are mere hearsay and are generally inadmissible as substantive evidence." *People v Lundy*, 467 Mich 254, 257; 650 NW2d 332 (2002). "Extrinsic evidence of a prior inconsistent statement can be used to impeach but it cannot be used to prove the truth of the matter asserted, unless, of course, it falls within a hearsay exception." *People v Jenkins*, 450 Mich 249, 273; 537 NW2d 828 (1995). Counsel for Seabrooks sought to elicit testimony, through Seabrooks, of statements allegedly made by Lewis approximately one year after the events comprising the subject of the criminal charges. As such, the statements comprised hearsay and were not admissible. Other than suggesting that the one statement comprised a prior inconsistent statement by Lewis, counsel for Seabrooks failed to identify any applicable hearsay exception to render the testimony admissible.

"Under MRE 613, subject to certain restrictions, a witness may be examined concerning a prior inconsistent statement for impeachment purposes." *People v Rodriguez*, 251 Mich App 10, 34; 650 NW2d 96 (2002). To impeach a witness with prior inconsistent statements in accordance with MRE 613, a party is required to initially establish a proper foundation "by questioning the witness concerning the time and place of the statement and the person to whom it was allegedly made." *Id*. at 34. "When a witness claims not to remember making a prior inconsistent statement, he may be impeached by extrinsic evidence of that statement." *Jenkins*, 450 Mich at 256; *People v Claybon*, 124 Mich App 385, 399; 335 NW2d 493 (1983). In this case, Seabrooks attempted to admit Lewis's alleged statements without first laying the proper foundation by establishing Lewis was unable to recall making a prior inconsistent statement. Counsel could not properly seek to impeach the testimony of Lewis through the testimony of Seabrooks.

Even if Seabrooks was entitled to admit the prior alleged statements to demonstrate an inconsistency with Lewis's trial testimony, it is unlikely that the purported error affected the outcome of the trial given the amount of evidence admitted demonstrating Seabrooks's presence and participation in the events. Therefore, any alleged error was harmless. See MCR 2.613(A).

Seabrooks also asserts that the omission of this testimony impeded his right to present a defense. Criminal defendants are guaranteed "a meaningful opportunity to present a complete defense." *People v Unger*, 278 Mich App 210, 249; 749 NW2d 272 (2008) (citations and quotation marks omitted). The right to present evidence is not, however, absolute. *Id*. at 250.

> A defendant's interest in presenting . . . evidence may thus bow to accommodate other legitimate interests in the criminal trial process. States have been traditionally afforded the power under the constitution to establish and implement their own criminal trial rules and procedures. . . . Michigan has a legitimate interest in promulgating and implementing its own rules concerning the conduct of trials. Our state has broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve. [*Id*. (citations and quotation marks omitted).]

The omission of the referenced testimony did not preclude the ability of Seabrooks to present a defense. Seabrooks was permitted to testify that Lewis's response to an inquiry regarding his

facial injury did not reference being shot by Williams or give any indication that he was fearful or resentful of Seabrooks for the events surrounding his injury. In addition, because the trial court did not abuse its discretion in excluding the statements, it did not deny Seabrooks his right to present a defense. *Id.*

III. UNAUTHORIZED AWARD OF COSTS

Defendants contend, in accordance with *People v Cunningham*, 496 Mich 145; 852 NW2d 118 (2014), that the trial court lacked the authorization to impose $600 in court costs.

"For an issue to be preserved for appellate review, it must be raised, addressed, and decided by the lower court." *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007). At sentencing, the trial court ordered each defendant to pay specified costs and fees, including $600 in court costs. Defendants failed to object when the trial court ordered them to pay the costs now being appealed. The issue is unpreserved. Because defendants failed to object when the trial court imposed the court costs, this Court reviews their challenge to the imposition of the costs for plain error. *People v Konopka*, 309 Mich App 345, 356; 869 NW2d 651 (2015). Issues of statutory interpretation are reviewed de novo. *Cunningham*, 496 Mich at 149.

Defendants ignore or fail to recognize this Court's recent decision in *Konopka* and the amendment of MCL 769.1k(1), which provides in relevant part:

(b) The court may impose any or all of the following:

(*i*) Any fine authorized by the statute for a violation of which the defendant entered a plea of guilty or nolo contendere or the court determined that the defendant was guilty.

(*ii*) Any cost authorized by the statute for a violation of which the defendant entered a plea of guilty or nolo contendere or the court determined that the defendant was guilty.

(*iii*) Until 36 months after the date the amendatory act that added subsection (7) is enacted into law, any cost reasonably related to the actual costs incurred by the trial court without separately calculating those costs involved in the particular case, including, but not limited to, the following:

(A) Salaries and benefits for relevant court personnel.

(B) Goods and services necessary for the operation of the court.

(C) Necessary expenses for the operation and maintenance of court buildings and facilities.

(*iv*) The expenses of providing legal assistance to the defendant.

(*v*) Any assessment authorized by law.

(*vi*) Reimbursement under section 1f of this chapter.

As recognized by this Court, the amended version of this statute became effective on October 17, 2014, and applies to all fines, costs, and assessments under MCL 769.1k before June 18, 2014, and after the effective date of the amendatory act. *Konopka*, 309 Mich App at 357. "The amended act was a curative measure to address the authority of courts to impose costs under MCL 769.1k before *Cunningham* was issued." *Konopka*, 309 Mich App at 357. MCL 769.1k(1)(b)(*iii*) now allows for an award of costs that "are *not* independently authorized by the statute for the sentencing offense . . . ." *Konopka*, 309 Mich App at 357. "In light of the adoption of 2014 PA 352, the trial court's imposition of costs was not erroneous." *Konopka*, 309 Mich App at 359.

We note that this Court in *Konopka*, *id*. at 359-360, remanded the matter to the trial court solely premised on the trial court's failure to establish a factual basis for the costs imposed. Specifically, this Court explained,

> without a factual basis for the costs imposed, we cannot determine whether the costs imposed were reasonably related to the actual costs, as required by MCL 769.1k(1)(b)(*iii*). In this case, defendant specifically challenges the lack of reasoning for the costs imposed, and we find that she should be given the opportunity to challenge the reasonableness of the costs imposed. [*Konopka*, 309 Mich App at 359-360.]

In this instance, defendants have only challenged the authority of the court to impose the referenced costs, not the reasonableness of the costs imposed. As such, we find no basis or reason to remand this issue to the trial court for further review or explanation.

## IV. PROSECUTORIAL MISCONDUCT

Seabrooks argues that the prosecutor erred in his opening statement by referencing the anticipated testimony of Payne following his entry into a plea agreement. Payne subsequently withdrew his plea shortly before testifying, resulting in Payne's participating in the trial as a defendant and, according to Seabrooks, causing undue prejudice and compromising Seabrooks's right of confrontation. Seabrooks further contends that the trial court's denial of a motion seeking a mistrial, premised on the prosecutor's opening statements and its effect following Payne's plea withdrawal, constituted error.

"In order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Technically, Seabrooks's appellate issue with regard to prosecutorial misconduct is unpreserved due to the absence of a contemporaneous objection to the statement now challenged. Given the circumstances of Payne's plea withdrawal, however, counsel did object as soon as reasonably possible and thus, we will treat the issue as preserved. In addition, Williams and Seabrooks requested a mistrial premised on this statement.

"We review claims of prosecutorial misconduct case by case, examining the remarks in context, to determine whether the defendant received a fair and impartial trial." *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001). A trial court's decision to deny a

-11-

motion for a mistrial is reviewed for an abuse of discretion. *People v Dennis*, 464 Mich 567, 572; 628 NW2d 502 (2001). "Whether the prosecutor's comments in the case before us amounted to error so grievous that it necessitated a mistrial is a question trusted to the sound discretion of the trial judge whose decision in the matter will not be reversed absent a clear abuse of discretion." *People v Bommarito*, 110 Mich App 207, 210; 312 NW2d 214 (1981).

On December 2, 2013, Payne entered into a plea agreement with the prosecutor's office, wherein he agreed to testify at trial. On December 5, 2013, the prosecutor gave his opening statement, along with counsel for Williams and Seabrooks. Payne was to be one of the initial witnesses to testify, but refused and sought to withdraw his plea shortly before he was scheduled to testify. In anticipation of Payne's testimony, the prosecutor's opening statement included the following:

> You may hear testimony from Demar Payne. Demar Payne, remember was the one who rode in the Taurus with Keith Williams, as it drove away from Cruse Street. Demar Payne is gonna telling [sic] you what happened that night as well as Terrence Griggs. As well as Lester Lewis.
>
> I ask that you pay very close attention to what they tell you. They were there. The evidence is gonna show they were there. Yes, they made deals to testify, and they're gonna testify and tell you what happened that night.

Counsel for Williams also referenced Payne in his opening statement:

> Terrence Griggs is suppose [sic] to be a cousin. And he comes to the house on a regular basis, just like Mr. Lewis. Mr. Payne, is like a family member. And he comes to the house on a regular basis, just like Mr. Lewis. But they want to act as if they don't really know each other.
>
> * * *
>
> The testimony is gonna also show that even Mr. Payne wants to say that I didn't shoot anybody. I didn't have a gun. I really didn't do a lot here. But I took 18 years [sic] to testify truthfully.

Counsel for Seabrooks did not reference Payne's anticipated testimony in his opening statement. Once made aware that Payne intended to refuse to testify and sought to withdraw his plea, counsel expressed concern for the content of the opening statements, specifically referencing Payne's anticipated testimony and the awkwardness of having a witness identified for the jury now assume a position at the defense table.

The prosecutor's reference to Payne's anticipated testimony cannot be construed as error on the part of the prosecutor, who was anticipating this individual serving as a witness. "The purpose of an opening statement is to tell the jury what the advocate proposes to show." *People v Moss*, 70 Mich App 18, 32; 245 NW2d 389 (1976) (KELLY, J., concurring), aff'd sub nom *People v Tilley*, 405 Mich 38 (1979). It is permissible for the prosecutor to comment on the evidence to be presented and any reasonable inferences to be drawn therefrom if the comments provide a fair introduction to the evidence. See *id*. Further, the statements by the prosecutor

-12-

cannot be construed as prejudicial to Seabrooks. First, any indication regarding the anticipated testimony of Payne was vague and general in nature and did not reference Seabrooks or his participation in the charged events. Second, at the time the statements were made, the prosecutor was acting in good faith as acknowledged by counsel for Seabrooks. "[P]rosecutorial misconduct cannot be predicated on good-faith efforts to admit evidence." *People v Noble*, 238 Mich App 647, 660; 608 NW2d 123 (1999).

Further, the trial court specifically instructed the jury "to return a true and just verdict based only on the evidence and my instructions on the law." In addition to instructing on the presumption of innocence, the trial court cautioned the jury regarding what comprised evidence and that in rendering a verdict the jury "may only consider the evidence that was properly admitted in the case." The trial court defined evidence as including "only the sworn testimony of the witnesses and the exhibits that were admitted into evidence." Examples of what did not comprise evidence included the "statements and arguments" of the attorneys. In addition, the trial court instructed the jury to "only accept things the lawyers say that are supported by the evidence or by your own common sense and general knowledge." As explained by this Court, "[c]urative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements and jurors are presumed to follow their instructions." *Unger*, 278 Mich App at 235 (citation omitted).

Seabrooks also contends that the statements by the prosecutor regarding the anticipated testimony of Payne violated his Sixth Amendment right to confrontation. While a Confrontation Clause issue can arise when a witness asserts the Fifth Amendment, it does not arise if a witness does not provide any substantive testimony. *People v Gearns*, 457 Mich 170, 186-187; 577 NW2d 422 (1998), overruled on other grounds *People v Lukity*, 460 Mich 484, 494; 596 NW2d 607 (1999). "A mere inference is simply insufficient for a Confrontation Clause violation." *Id*. The prosecutor generally referenced in his opening statement that Payne, a codefendant of Seabrooks, was anticipated to testify as a witness. Payne unexpectedly reneged on his agreement with the prosecutor and did not actually testify. Consequently, Payne did not provide any substantive testimony that was harmful to Seabrooks. Because the prosecutor only referred to a witness who never testified in the case, defendant's right to confront the witnesses against him was not violated by the prosecutor's remark in his opening statement.

The trial court's decision to deny the request for a mistrial was not an abuse of discretion. "A mistrial should be granted only for an irregularity that is prejudicial to the rights of the defendant . . . and impairs his ability to get a fair trial . . . ." *People v Haywood*, 209 Mich App 217, 228; 530 NW2d 497 (1995). "[T]he prosecutorial error complained of in this case was not of such a magnitude that the granting of a mistrial was 'a manifest necessity.' "[1] *Bommarito*, 110 Mich App at 211. Clearly, the remark of the prosecutor in his opening statement was not

---

[1] "Manifest necessity 'appears to refer to the existence of sufficiently compelling circumstances that would otherwise deprive the defendant of a fair trial or make its completion impossible.' " *People v Echavarria*, 233 Mich App 356, 363; 592 NW2d 737 (1999), quoting *People v Rutherford*, 208 Mich App 198, 202; 526 NW2d 620 (1994).

"motivated by bad faith or undertaken to harass or prejudice the defendant." *Id*. "[T]his Court has held that when a prosecutor states that evidence will be submitted to the jury, and the evidence is not presented, reversal is not warranted if the prosecutor did so acting in good faith." *People v Wolverton*, 227 Mich App 72, 75; 574 NW2d 703 (1997). Further, Seabrooks has failed to demonstrate any prejudice regarding the opening statement. Seabrooks's right to a fair trial was sufficiently protected by the trial court's limiting instruction to the jury, because jurors are presumed to follow their instructions. See *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). As such, Seabrooks has failed to make an affirmative showing of prejudice or to demonstrate that the trial court abused its discretion in denying a motion for a mistrial. *People v Vettese*, 195 Mich App 235, 246; 489 NW2d 514 (1992).

## V. DUAL JURY

Seabrooks and Williams contend the trial court erred in failing to grant them a trial that was separate from their codefendants Payne and Miller, alleging that their defenses were antagonistic to those of their codefendants. They further argue that the trial court erred in failing to grant their request to remove their jury during cross-examination of Lewis by counsel for Payne, resulting in prejudice and a violation of their right to due process.

"Generally, a trial court's 'ultimate ruling on a motion to sever is reviewed for an abuse of discretion.' " *People v Williams*, 483 Mich 226, 234 n 6; 769 NW2d 605 (2009), quoting *People v Girard*, 269 Mich App 15, 17; 709 NW2d 229 (2005). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *People v Buie*, 491 Mich 294, 320; 817 NW2d 33 (2012). Preserved evidentiary issues are reviewed for an abuse of discretion. *Orr*, 275 Mich App at 588.

"When 2 or more defendants shall be jointly indicted for any criminal offense, they shall be tried separately or jointly, in the discretion of the court." MCL 768.5. "A strong policy favors joint trials in the interest of judicial economy; a defendant does not have an absolute right to a separate trial." *People v Hoffman*, 205 Mich App 1, 20; 518 NW2d 817 (1994). In accordance with MCR 6.121(C), a trial court "must sever the trial of defendants on related offenses on a showing that severance is necessary to avoid prejudice to substantial rights of the defendant."

Seabrooks and Williams contend that severance was appropriate in the current circumstances because their defense theory was antagonistic to Payne's. However, "[s]everance is mandated under MCR 6.121(C) only when a defendant provides the court with a supporting affidavit, or makes an offer of proof, that clearly, affirmatively, and fully demonstrates that his substantial rights will be prejudiced and that severance is the necessary means of rectifying the potential prejudice." *People v Hana*, 447 Mich 325, 346; 524 NW2d 682 (1994), amended on reh sub nom *People v Gallina*, 447 Mich 1203 (1994), and amended on reh sub nom *People v Rode*, 447 Mich 1203 (1994). "The failure to make this showing in the trial court, absent any significant indication on appeal that the requisite prejudice in fact occurred at trial, will preclude reversal of a joinder decision." *Id*. at 346-347. "Inconsistency of defenses is not enough to mandate severance; rather, the defenses must be mutually exclusive or irreconcilable." *Id*. at 349 (citations and quotation marks and citations omitted). Defendants are not entitled to severance simply because they "may have a better chance of acquittal in separate trials," because the

defendants may "attempt to escape conviction by pointing the finger at each other," or merely because another defendant may testify at trial. *Id*. at 349-350 (citations and quotation marks omitted). To warrant severance, the defenses presented must be "mutually exclusive" or "irreconcilable," which means that the "jury, in order to believe the core of the evidence offered on behalf of one defendant, must disbelieve the core of the evidence offered on behalf of the co-defendant." *Id*. at 349-350 (citations and quotation marks omitted).

Seabrooks and Williams both denied being present in the home at the time of the shootings. In contrast, Payne and Miller acknowledged being present but denied active participation in the events. Although the proposed defenses involved blame shifting, they are not "mutually exclusive." The prosecutor's theory of the case was that Williams was the principal with his codefendants acting as aiders and abettors. Seabrooks and Williams do not assert a right to severance premised on the possibility of a *Bruton*[2] error, because the trial court confirmed it would exclude juries should any codefendant testify. The risk of prejudice is significantly reduced where, as here, Williams was charged as a principal and the remaining codefendants as aiders and abettors. "Fingerpointing by the defendants when such a prosecution theory is pursued does not create mutually exclusive antagonistic defenses. The properly instructed jury could have found both defendants similarly liable without any prejudice or inconsistency because one found guilty of aiding and abetting can also be held liable as a principal." *Hana*, 447 Mich at 360-361.

Seabrooks and Williams more specifically argue that the trial court erred in permitting their jury to be present for the cross-examination of non-codefendant witnesses, such as Lewis by counsel for Payne. If believed, the testimony elicited from Lewis indicated that all defendants, including Seabrooks and Williams, were present and armed within the home during the events alleged, with Williams serving as the principal and Seabrooks and the remaining codefendants as aiders and abettors. The defense strategy of both Seabrooks and Williams was to discredit the testimony of Lewis and Griggs as incredible. As discussed by the Michigan Supreme Court:

> "[A] fair trial does not include the right to exclude relevant and competent evidence." All of the evidence and testimony admitted at the dual trial would have been available for use at either of the defendants' separate trials. It is not dispositive that the evidence was presented here by counsel for a codefendant, rather than the prosecutor. None of the evidence was "probative of a defendant's guilt but technically admissible only against a codefendant" as a possible basis for severance. Nor were the defendants barred from presenting "essentially exculpatory evidence that would be available to a defendant tried alone, but unavailable in a joint trial." [*Hana*, 447 Mich at 362 (citations omitted).]

---

[2] *Bruton v United States*, 391 US 123; 88 S Ct 1620; 20 L Ed 2d 476 (1968) (finding that a defendant is deprived of the Sixth Amendment right to confront witnesses when a nontestifying codefendant's statement implicating the defendant is introduced at a joint trial.).

None of the testimony elicited from Lewis on cross-examination by Payne's counsel varied, in any significant manner, from that elicited by the prosecutor or counsel for Seabrooks and Williams on cross-examination.

As concluded by the *Hana* Court:

[A]lthough we certainly recognize the potential for confusion in the dual-jury procedure, we do not find such circumstances in the instant cases. The defendants were given every opportunity to present complete defenses before their respective juries, and they have failed to demonstrate how the juries' abilities to render fair decisions were adversely affected. The dual-jury procedure had the advantage of presenting the state's case, which was equally admissible against [] defendants, in one setting, with all witnesses testifying at only a single proceeding. The appropriate cautionary instructions were given, with the reasonable presumption that the juries followed these instructions to consider the evidence against each defendant separately. [*Id.* at 362-363.]

Based on the absence of any demonstrated prejudice to the substantial rights of Seabrooks or Williams, it was not an abuse of discretion for the trial court to conduct a joint trial with separate juries. The denial of the request to remove the Seabrooks and Williams jury during cross-examination of a witness by counsel for a codefendant did not comprise error.

VI. INEFFECTIVE ASSISTANCE OF COUNSEL

Williams and Seabrooks contend their respective trial counsel were ineffective. Williams further argues that his appellate counsel is also ineffective.

To preserve a claim of ineffective assistance of trial counsel, a defendant must file a motion for a new trial or for a *Ginther*[3] hearing in the lower court. See *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). "[T]he test for ineffective assistance of appellate counsel is the same as that applicable to a claim of ineffective assistance of trial counsel." *People v Uphaus*, 278 Mich App 174, 186; 748 NW2d 899 (2008). The issues are not properly preserved for appellate review based on the failure to file a motion for a new trial or seek an evidentiary hearing.

"A claim of ineffective assistance of counsel is a mixed question of law and fact. A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *Petri*, 279 Mich App at 410 (citation omitted). This Court's review of unpreserved claims of ineffective assistance of counsel is limited to mistakes apparent on the record. *Unger*, 278 Mich App at 253. To show ineffective assistance of appellate counsel it must be shown that appellate counsel's decision not to raise certain issues on appeal "fell below an objective standard of reasonableness and prejudiced [defendant's] appeal." *Uphaus*, 278 Mich App at 186.

---

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Initially, Williams and Seabrooks contend that their respective trial counsel were ineffective. Their allegations of error are, however, without reference to the transcripts or other explanation and fail to explicate or identify the law specifically relevant to the alleged errors. Although courts will, in general, be liberal in construing pro se briefs, "even pro se litigants must brief arguments in order to preserve them." *Mapes v Bishop*, 541 F3d 582, 584 (CA 5, 2008). The "rule of liberal construction stops . . . at the point at which we begin to serve as [an] advocate." *United States v Pinson*, 584 F3d 972, 975 (CA 10, 2009). "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment [of an issue] with little or no citation of supporting authority." *Watson*, 245 Mich App at 587 (citation and quotation marks omitted). The "failure to cite any supporting legal authority constitutes an abandonment of this issue." *Id.* While Seabrooks and Williams have abandoned this issue on appeal due to the failure to cite legal authority and provide arguments with proper citation to the lower court record, we find their claims to lack merit.

This Court has addressed the burdens inherent in a claim for ineffective assistance of counsel:

> Effective assistance of counsel is presumed and defendant bears the burden of proving otherwise. To succeed on a claim of ineffective assistance of counsel, the defendant must show that, but for an error by counsel, the result of the proceedings would have been different, and that the proceedings were fundamentally unfair or unreliable. The defendant bears a heavy burden on these points. Defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight. [*Petri*, 279 Mich App at 410-411 (citation and quotation marks omitted).]

The assertion that counsel was deficient for failing to object to or successfully suppress the admission of evidence from the Cruse Street address is without merit. Because this claim is thoroughly addressed in Issue XI, *infra*, the legal analysis will not be replicated here.[4]

Seabrooks and Williams next contend that counsel was ineffective for permitting the testimony of evidence technician Lori Briggs regarding her procurement of suspected blood samples from the Cruse Street address without commensurate proof of the testing of the substance as blood or the determination of DNA to match to the victims or defendants. Briggs

---

[4] It is assumed that the evidence alleged to have been wrongfully procured was that obtained from the Cruse Street address. This is mere supposition, however, due to the lack of specificity in the pleadings because other evidence pertaining to a shirt, a car key and spent cartridges were obtained by police during a search of Sandria Slay's residence at 19737 Plainview in Detroit. Any suggestion regarding the impropriety of the search conducted at the Plainview address is without merit given Slay's acknowledgment that she gave the police verbal permission to conduct the search and signed the search warrant for that location.

testified that she procured three suspected blood samples from the inner side entry door at the Cruse Street residence, in addition to samples procured from the second step into the home's basement, near the south wall of the basement floor and from an outside edge of the basement refrigerator. Briggs indicated that the substances retrieved were "suspected" to be blood but did not affirmatively state they were blood. Given the amount of testimony from eyewitnesses regarding what occurred in the home, it was arguably a matter of trial strategy by defense counsel not to emphasize or draw attention to the suspected blood evidence. By not challenging the evidence and the failure to secure testing of the substance, defense counsel was able to avoid definitive proof that a shooting occurred within the home through incontestable identification of a victim's blood at that location. Instead, given the uncertainty of the substance samples procured by Briggs, defense counsel could focus on the credibility of the prosecution's witnesses without having physical evidence to verify their testimony, thereby avoiding the proverbial final nail in the coffin for Seabrooks and Williams.

It is also claimed that trial counsel was ineffective for referencing a portion of Payne's statement suggesting Williams stated, "I don't normally shoot girls," and failing to obtain a mistrial based on that statement. The cited reference occurred outside the presence of the jury while defense counsel were seeking a mistrial based on the prosecutor's indication in his opening statement that Payne would testify as a witness. Given the circumstances surrounding this colloquy, defendants cannot demonstrate any prejudice.

Seabrooks and Williams also contend that trial counsel was ineffective for failing to provide them with a discovery packet that allegedly prevented their ability to be informed of the evidence against them and to assist in providing an adequate defense. Other than a vague allegation, Seabrooks and Williams do not explain how they were prejudiced or identify what information they lacked. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment [of an issue] with little or no citation of supporting authority." *Id.* at 59 (citations and quotation marks omitted). Based on the absence of any factual allegations or support for this pro se argument and the cursory treatment, we deem this aspect of the issue abandoned. *Id.*

Finally, Williams asserts his appellate counsel is ineffective for failing to raise "dead bang winning" issues, which according to Williams by necessity require an assertion of a constitutional violation. Williams argues that appellate counsel failed to identify or raise an issue on appeal pertaining to his assertion of an illegal search and seizure and the admission of evidence obtained therefrom at trial. While perhaps constitutional in nature, the issue is not a "dead bang" winner as discussed in detail in conjunction with Issue XI, *infra*. The failure to raise meritless issues cannot be construed to constitute the ineffective assistance of counsel. See *People v Reed*, 449 Mich 375, 391; 535 NW2d 496 (1995).

Williams also takes issue with his appellate counsel's failure to timely submit motions and support for his filing of a Standard 4 brief with this Court. While this Court's docket sheet indicates an exchange of communications and the return of certain pleadings sent directly by Williams to the Court, ultimately Williams was granted his requested extension and permitted to file a pro se brief in addition to the appellate brief submitted by his counsel. Williams is unable to demonstrate any prejudice because the issues he contends to be "winners" are before this Court for review.

## VII.  COMPETENCY EXAMINATION

Payne contends that the trial court erred in denying his request for a competency hearing and that his trial counsel was ineffective for failing to successfully obtain such a hearing.

"The determination of a defendant's competence is within the trial court's discretion." *People v Newton*, 179 Mich App 484, 488; 446 NW2d 487 (1989).  Specifically:

> "Although the determination of a defendant's competence is within the trial court's discretion, a trial court has the duty of raising the issue of incompetence where facts are brought to its attention which raise a 'bona fide doubt' as to the defendant's competence.  However, the decision as to the existence of a 'bona fide doubt' will only be reversed where there is an abuse of discretion." [*People v Kammeraad*, 307 Mich App 98, 138; 858 NW2d 490 (2014), quoting *People v Harris*, 185 Mich App 100, 102; 460 NW2d 239 (1990) (citations omitted).]

"[A]n abuse of discretion occurs only when the trial court's decision is outside the range of reasonable and principled outcomes." *Kammeraad*, 307 Mich App at 140 (citation and quotation marks omitted).

A history of the events and proceedings involving Payne is necessary to place his request for a competency hearing, and the trial court's ruling, in the proper context.  On December 2, 2013, Payne entered into a plea agreement with a "special agreement for consideration." Counsel averred that Payne had been apprised of his rights and had executed the agreements. Payne was placed under oath and questioned by the trial court regarding the agreements.  The trial court reviewed in detail the terms of the plea and mandatory penalties.  The trial court then proceeded to engage Payne in a series of questions confirming his understanding of the plea, the consequences of the plea and his preference "to take advantage of the plea," receiving consistently affirmative responses from Payne.  In addition, the trial court reviewed each of Payne's "rights to make sure that you understand you're giving up them."  Payne confirmed that he read the plea agreement and that he understood its contents.  Payne denied having any questions regarding the agreement when asked by the trial court.  When specifically questioned by the trial court, Payne acknowledged reading and understanding his plea.  Payne agreed that his plea was voluntary and denied having been coerced or promised anything for entering into the plea.

Through a series of open-ended questions, the trial court asked Payne about the events and his actions to establish the factual predicates for the charges.  The prosecutor and defense counsel also participated in eliciting responses from Payne by posing additional questions regarding various elements of the charged crimes.  At the conclusion of the inquiry, the trial court found a "sufficient factual basis to accept the plea" and that "the plea was voluntarily entered as well as knowing, and intelligent."  At this time, the trial court also informed Payne that one of his codefendants had recently withdrawn from his plea agreement and informed Payne he would "be the first witness in this case."  The trial court advised Payne of the consequences he would face should he fail to abide by the plea agreement. Payne affirmatively acknowledged his understanding.

Following the opening statements of counsel at trial, Payne declined to testify. The next day, Payne sought to withdraw his plea, asserting "My understanding wasn't what is it [sic]," and requested a "competency referral." The trial court then engaged in the following discussion with Payne's counsel, Gil Whitney McRipley:

>*The Court*: You didn't understand the plea?

>*Defense Counsel:* Yeah. He wants a competency referral.

>*The Court:* Okay. Well, that's not gonna happen.

>*Defense Counsel:* I'm just making, putting it on the record.

>*The Court:* Okay. That's fine.

>*Defense Counsel:* Just so the record is clear, I talked to Mr. Payne as well as his mother. He does have some mental history in his past. He's also indicated that things were going to [sic] fast. And the whole incident has clouded his mind. It's hard for him to help him to assist in trial. And he feels that's [sic] he's not competent to stand trial.

>*The Court:* Okay. Well, I went over everything in the plea proceeding with him. And Mr. Payne, I don't know if you understand this, but you're presumed to be competent. Now, you're raising the competency issue now after we've already had a number of proceedings and after you entered into a voluntary and knowing plea in this case.

>So, I don't think that there's any legitimate issue to raise competency at this point. And given the fact that we have, it's never been raise [sic] before today by your attorney. Also, am I right in understanding you're not gonna testify? In the other case you're refusing to testify? You have to say yes or no?

>*Payne:* Yes.

"The conviction of an individual when legally incompetent violates due process of law." *In re Carey*, 241 Mich App 222, 227; 615 NW2d 742 (2000). MCL 330.2020(1) states:

>A defendant to a criminal charge shall be presumed competent to stand trial. He shall be determined incompetent to stand trial only if he is incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner. The court shall determine the capacity of a defendant to assist in his defense by his ability to perform the tasks reasonably necessary for him to perform in the preparation of his defense and during his trial.

Mental competency in criminal cases is addressed in MCR 6.125(B):

The issue of the defendant's competence to stand trial or to participate in other criminal proceedings may be raised at any time during the proceedings against the defendant. The issue may be raised by the court before which such proceedings are pending or being held, or by motion of a party. Unless the issue of defendant's competence arises during the course of proceedings, a motion raising the issue of defendant's competence must be in writing. If the competency issue arises during the course of proceedings, the court may adjourn the proceeding or, if the proceeding is defendant's trial, the court may, consonant with double jeopardy considerations, declare a mistrial.

Importantly, a defendant is presumed competent to stand trial unless his mental condition precludes his ability to understand the nature and object of the proceedings against him or the court determines he is incapable of assisting in his defense. MCL 330.2020(1). A test applied in reviewing a trial court's determination regarding competence "is whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Kammeraad*, 307 Mich App at 138-139 (citations and quotation marks omitted).

Based on the lower court record, the trial court did not abuse its discretion in failing to grant Payne's request for a competency examination. As noted by the trial court, it was suspect that the proceedings had advanced to such a stage without Payne, his counsel, the prosecutor or trial court having observed the display of any problematic behavior or expressed concerns regarding Payne's competency to stand trial. Numerous hearings had occurred without any question being raised regarding Payne's ability to comprehend and participate in the proceedings. Especially telling is Payne's involvement in a plea agreement. All of the individuals involved in the plea agreement, including Payne, were able to indicate that Payne had an understanding of the agreement, the elements of the crimes charged and his actions. Specifically, Payne's answers in response to questions posed at the plea hearing demonstrated that he was "capable of understanding the nature of the charges brought against him and capable of rationally assisting in his defense . . . ." *Kammeraad*, 307 Mich App at 140. This merely appears to be a case of "buyer's remorse" that arose when the time came for Payne to fulfill his part of the plea agreement. As such, the trial court's denial of Payne's request for a competency examination did not comprise error. Based on the adequacy of the procedures in the trial court, coupled with Payne's inability to overcome the presumption that he was competent to stand trial, there can be no demonstration that Payne was denied his constitutional right to a fair trial. See *Drope v Missouri*, 420 US 162, 172; 95 S Ct 896; 43 L Ed 2d 103 (1975).

Payne further asserts that the failure of his trial counsel to somehow procure a competency hearing deprived him of the effective assistance of counsel. To show ineffective assistance of counsel, a defendant must establish that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). Payne's counsel did, albeit half-heartedly, raise a request for a competency hearing. Other than Payne's own self-serving indications of confusion, there was no evidence to support his contention that he was incompetent to stand trial. In fact, Payne appeared before the trial court with his counsel on several prior occasions without indication of any concern for his mental health or ability to comprehend the proceedings and specifically and

affirmatively engaged in discourse with the trial court, in conjunction with his plea agreement, which would belie any such assertion of incompetency. His counsel could not fabricate a basis for a competency hearing when one clearly did not exist. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Merely because a defense counsel's efforts or strategy were unsuccessful does not equate to ineffective assistance of counsel. *People v Kevorkian*, 248 Mich App 373, 414-415; 639 NW2d 291 (2001).

## VIII.  SUBSTITUTE COUNSEL

Payne contends the trial court erred in refusing his request to appoint new counsel and that the trial court's refusal violated his constitutional rights. "A trial court's decision regarding substitution of counsel will not be disturbed absent an abuse of discretion. A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *People v Strickland*, 293 Mich App 393, 397; 810 NW2d 660 (2011) (citations and quotation marks omitted).

At the hearing pertaining to Payne's plea withdrawal, his attorney indicated that Payne had made a request for alternative counsel, which was denied by the trial court. The issue of alternative counsel was raised again on December 9, 2013, with Payne directly addressing the trial court, asserting a lack of communication with his counsel. Payne's trial counsel did not object to a substitution and asserted a lack of prejudice based on the prosecution's witnesses, Lewis and Griggs, being in jail. Payne's trial counsel explained his client had complained, "I'm not doing my job. He told me I'm on the prosecutor, I'm working with the prosecution. That's what he's telling me. And I, you know, it's putting me in a bad situation just for grievances down the line." The trial court denied the request, characterizing it as a "stall tactic."

"Appointment of a substitute counsel is warranted only upon a showing of good cause and where substitution will not unreasonably disrupt the judicial process. Good cause exists where a legitimate difference of opinion develops between a defendant and his appointed counsel with regard to a fundamental trial tactic." *Id*. (citations and quotation marks omitted). Payne did not challenge the competency of his counsel, stating merely that he desired more and better communication with him. Payne's complaints "lacked specificity and did not involve a difference of opinion with regard to a fundamental trial tactic." *Id*. at 398. "A mere allegation that a defendant lacks confidence in his or her attorney, unsupported by a substantial reason, does not amount to adequate cause. Likewise, a defendant's general unhappiness with counsel's representation is insufficient." *Id*. (citation omitted). Although Payne contends, in general, that he disagreed with counsel on important points of trial strategy, he fails to identify any such disagreements. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Further, "[c]ounsel's decisions about defense strategy, including what evidence to present and what arguments to make, are matters of trial strategy, and disagreements with regard to trial strategy or professional judgment do not warrant appointment of substitute counsel." *Strickland*, 293 Mich App at 398 (citation omitted).

Payne delayed until trial was beginning to both withdraw his plea and to request substitution of counsel. All parties were ready to proceed and the matter had been pending for more than a year. "A substitution of counsel at that point would have unreasonably delayed the judicial process." *Id*. at 399. Further, any complaint by Payne that he lacked recent interaction with counsel is directly attributable to Payne's acceptance of a plea agreement. With the agreement in place, the need for counsel's involvement was extremely limited. It was only Payne's last minute decision to withdraw his plea on the day of his testimony that altered his situation and limits the validity of any complaint regarding counsel's lack of recent communication. As such, the trial court did not abuse its discretion in denying Payne's request for alternative counsel.

Payne further asserts, on appeal, that the denial of his request for substitute counsel violated his constitutional rights. "The Sixth Amendment guarantees an accused the right to retain counsel of choice." *People v Akins*, 259 Mich App 545, 556; 675 NW2d 863 (2003) (citation and quotation marks omitted). "However, the right to counsel of choice is not absolute." *Id*. at 557 (citation and quotation marks omitted). "A balancing of the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice is done in order to determine whether an accused's right to choose counsel has been violated." *Id*. (citations and quotation marks omitted).

> "When reviewing a trial court's decision to deny a defense attorney's motion to withdraw and a defendant's motion for a continuance to obtain another attorney, we consider the following factors: (1) whether the defendant is asserting a constitutional right, (2) whether the defendant has a legitimate reason for asserting the right, such as a bona fide dispute with his attorney, (3) whether the defendant was negligent in asserting his right, (4) whether the defendant is merely attempting to delay trial, and (5) whether the defendant demonstrated prejudice resulting from the trial court's decision." [*Id.*, quoting *People v Echavarria*, 233 Mich App 356, 369; 592 NW2d 737 (1999).]

Payne's request for substitute counsel happened on the day of trial. His claims of dissatisfaction with his attorney comprised issues pertaining to the frequency of his communication, but did not allege any deficiency in performance or disagreement regarding the theories to be pursued at trial. The trial court's refusal to accommodate Payne's request, given that juries had already been selected and witnesses detained and given the pendency of this matter for over one year, coupled with the timing of Payne's request and the insufficient basis for the request, was not an abuse of discretion. Any postponement of these trials would have placed a heavy burden on the trial court and Payne's codefendants, their trial counsel and witnesses. The trial court's refusal to permit a substitution of counsel at a late juncture in the proceedings was not a violation of Payne's constitutional rights.

## IX. IMPROPER VOUCHING

Payne argues that the prosecutor improperly elicited testimony from Griggs regarding his plea in exchange for leniency in sentencing for the homicides. It was disclosed that, as part of the plea agreement for Griggs, he was to testify "truthfully" at trial. Payne asserts this was the

equivalent of the prosecutor improperly vouching for the credibility of Griggs and that his trial counsel was ineffective for failing to object to this testimony.

"Appellate review of improper prosecutorial remarks is generally precluded absent objection by counsel because the trial court is otherwise deprived of an opportunity to cure the error. An exception exists if a curative instruction could not have eliminated the prejudicial effect or where failure to consider the issue would result in a miscarriage of justice." *People v Stanaway*, 446 Mich 643, 687; 521 NW2d 557 (1994) (citations omitted). Payne did not object to the inquiries by the prosecutor regarding Griggs's plea agreement, and therefore his claim of prosecutorial misconduct is not preserved for appellate review. Unpreserved issues of prosecutorial misconduct are reviewed for "plain error that affected [defendant's] substantial rights." *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004). "We will reverse only if we determine that, although defendant was actually innocent, the plain error caused him to be convicted, or if the error seriously affected the fairness, integrity, or public reputation of judicial proceedings, regardless of his innocence." *Id*. (citation and quotation marks omitted).

At the initiation of Griggs's testimony, the prosecutor questioned Griggs regarding his status as a defendant in the case and his agreement to enter a guilty plea along with the terms of that agreement. Specifically, on inquiry, Griggs acknowledged his plea to two counts of second-degree murder and a count of felony-firearm in exchange for a sentence of 10 to 40 years' imprisonment for each second-degree murder conviction, plus two years' imprisonment for the felony-firearm conviction. Griggs appeared at trial in a prison uniform verifying his current incarceration. In addition, the following exchange occurred between the prosecutor and Griggs:

*Q*. And you'd agree to plead guilty to two counts of second degree murder and you agreed also to testify truthfully, didn't you?

*A*. Yes.

*Q*. And you agreed to give a truthful statement, correct?

*A*. Yes.

\* \* \*

*Q*. So Mr. Griggs you plead guilty on February 5, 2013, is that correct?

*A*. Yes.

*Q*. Mr. Griggs you gave Sergeant Hart a statement in relation to your plea agreement, correct?

*A*. Yes.

*Q*. And you indicted that that was—that you agreed to give a truthful statement, is that your testimony?

*A*. Yes.

-24-

Payne contends on appeal that the prosecutor's elicitation from Griggs of an acknowledgement that he was required to testify truthfully as part of his plea agreement constituted improper vouching regarding the credibility of this witness and that the failure of Payne's counsel to object comprised ineffective assistance of counsel.

"A prosecutor is not permitted to vouch for the credibility of his or her witnesses to the effect that [the prosecutor] has some special knowledge concerning a witness'[s] truthfulness. However, merely [b]y calling a witness who testifies pursuant to an agreement requiring him to testify truthfully, the Government does not insinuate possession of information not heard by the jury and the prosecutor cannot be taken as having expressed his personal opinion on a witness'[s] veracity." *People v Wood*, 307 Mich App 485, 505; 862 NW2d 7 (2014) (citations and quotation marks omitted). A review of the trial court record demonstrates that the inquiry by the prosecutor with regard to Griggs's plea agreement did not encompass an improper "suggest[ion] that the government had some special knowledge, not known to the jury, that the witness was testifying truthfully." *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995) (citations and quotation marks omitted).

"Further, even if the prosecutor's statements were improper, the trial court's instructions, which emphasized that the prosecutor's [questions and arguments were] not evidence and that the jury alone had the responsibility to determine witness credibility, cured any potential prejudice." *Wood*, 307 Mich App at 506. Based on the absence of any comments regarding the credibility of Griggs, the prosecutor's questioning was not improper and sufficiently limited.

Payne also contends that the failure of his trial counsel to object to the inappropriate remarks constitutes ineffective assistance of counsel. Because the prosecutor's questions did not comprise improper conduct, the failure of defense counsel to object to the prosecution's questioning did not constitute ineffective assistance of counsel.

## X. DOUBLE JEOPARDY

The judgments of sentence for Williams, Payne and Miller reflect multiple convictions of murder for one victim, reflecting the improper imposition of multiple punishments for offenses arising out of a single transaction. Specifically, Williams, Payne and Miller have multiple convictions and sentences for the murder of Bostick, with Williams and Payne also having multiple murder convictions and sentences for the death of Jordan.

To preserve appellate review of a double-jeopardy violation, a defendant must object at the trial court level. See *People v Meshell*, 265 Mich App 616, 628; 696 NW2d 754 (2005). Defendants did not object at sentencing or raise the issue of double jeopardy until appeal. However, a double-jeopardy issue "presents a significant constitutional question that will be considered on appeal regardless of whether the defendant raised it before the trial court." *People v McGee*, 280 Mich App 680, 682; 761 NW2d 743 (2008). This Court reviews "an unpreserved claim that a defendant's double jeopardy rights have been violated for plain error that affected the defendant's substantial rights, that is, the error affected the outcome of the lower court proceedings. Reversal is appropriate only if the plain error resulted in the conviction of an innocent defendant or seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id*. (citation omitted).

"Multiple murder convictions arising from the death of a single victim violate double jeopardy." *People v Clark*, 243 Mich App 424, 429; 622 NW2d 344 (2000). "The remedy for conviction of multiple offenses in violation of double jeopardy is to affirm the conviction on the greater charge and to vacate the conviction on the lesser charge." *Meshell*, 265 Mich App at 633-634.

With regard to Williams, it is undisputed that a jury found him guilty of both felony murder, MCL 750.316(1)(b), and first-degree premeditated murder, MCL 750.316(1)(a), with regard to Bostick. Williams's judgment of sentence improperly lists both murder convictions and sentences for this one victim. This Court will uphold a single conviction premised on two alternative theories. *People v Williams*, 265 Mich App 68, 72; 692 NW2d 722 (2005), aff'd 475 Mich 101 (2006). It is incorrect, as in this case, for the judgment of sentence to reflect two counts of murder and two sentences for the one victim. Cf. *id.*; see also *People v Bigelow*, 229 Mich App 218, 220-221; 581 NW2d 744 (1998). Double jeopardy protections entitle Williams to a judgment of sentence that accurately reflects only one count of murder supported by two theories and only one sentence for this one victim. *Id.* A similar issue occurs with regard to Williams's convictions and sentences pertaining to Jordan. Williams was found guilty of both felony murder, MCL 750.316(1)(b), and second-degree murder, MCL 750.317, with regard to Jordan. In this situation, the appropriate remedy is to affirm the conviction of the higher charge and to vacate the lower conviction." *Meshell*, 265 Mich App at 633-634.

As such, this Court must remand to the trial court for a correction of the judgment of sentence for Williams. The amended judgment of sentence should indicate one conviction of first-degree murder based on two theories, with one sentence for first-degree murder, with regard to Bostick. The judgment of sentence for Williams should also be amended to reflect one conviction and sentence for felony murder with regard to Jordan and the vacating of the conviction and sentence for second-degree murder.

A similar need for amendment of Payne's judgment of sentence exists. Payne was convicted and sentenced for second-degree murder, MCL 750.317, and felony murder, MCL 750.316(1)(b), for Bostick's death. He was convicted and sentenced for first-degree premeditated murder, MCL 750.316(1)(a), and felony murder, MCL 750.316(1)(b), for Jordan's death. We remand this matter to the trial court for correction of Payne's judgment of sentence to reflect a conviction and sentence for felony murder for Bostick's death and a conviction and sentence for first-degree murder for Jordan's death.

Although Miller has not raised a double jeopardy issue on appeal, he is also entitled to the correction of his judgment of sentence. Miller was convicted of both second-degree murder, MCL 750.317, and felony murder "based on torture," MCL 750.316(1)(b), with regard to Bostick. In this circumstance, it is appropriate to affirm the conviction of the higher charge and to vacate the lower conviction.

## XI. WARRANTLESS SEARCH

Williams contends that the police lacked a reasonable justification for entry into the Cruse Street residence without having first procured a warrant. As a result, Williams argues, any evidence seized from the residence by officers should have been suppressed at trial.

A review of the lower court record indicates that Williams did not file a separate motion or join in the motion by Miller to preclude the evidence.[5]  Williams did not object to the admission of the now-challenged evidence at trial.  As such, this issue is not preserved for appellate review.  *People v Carroll*, 396 Mich 408, 411-412; 240 NW2d 722 (1976).  Because Williams did not preserve this issue by moving to suppress the evidence in the trial court, this Court's review is limited to ascertaining whether plain error occurred that affected his substantial rights.  *People v Cross*, 281 Mich App 737, 738; 760 NW2d 314 (2008).  In accordance with the plain error rule, Williams is required to demonstrate that (a) an error occurred, (b) the error was plain (i.e., clear or obvious), and (c) the error affected a substantial right.  *Id*.

"The lawfulness of a search or seizure depends on its reasonableness."  *People v Beuschlein*, 245 Mich App 744, 749; 630 NW2d 921 (2001).  "A warrantless search is unreasonable per se unless there exists both probable cause and circumstances establishing one of the delineated exceptions to the warrant requirement."  *People v Anthony*, 120 Mich App 207, 210; 327 NW2d 441 (1982).  "Probable cause has been defined as a state of mind which stems from some fact, circumstance or information which would create an honest belief in the mind of a reasonably prudent person."  *Id*. at 211.

The exclusionary rule requires the suppression at trial of evidence seized in an unconstitutional search.  *People v Hawkins*, 468 Mich 488, 498-499; 668 NW2d 602 (2003).  "Additionally, the exclusionary rule prohibits the introduction into evidence of materials and testimony that are the products or indirect results of an illegal search, the so-called 'fruit of the poisonous tree' doctrine."  *People v Stevens*, 460 Mich 626, 633-634; 597 NW2d 53 (1999).  Application of the exclusionary rule "has been restricted to those instances where its remedial objectives are thought most efficaciously served."  *People v Reese*, 281 Mich App 290, 295; 761 NW2d 405 (2008) (citation and quotation marks omitted).

"A search or seizure is considered unreasonable when it is conducted pursuant to an invalid warrant or without a warrant where the police officer's conduct does not fall within one of the specific exceptions to the warrant requirement."  *People v Hellstrom*, 264 Mich App 187, 192; 690 NW2d 293 (2004).  Several exceptions exist to the warrant requirement, including exigent circumstances, emergency assistance and community caretaking.  *People v Slaughter*, 489 Mich 302, 311-312; 803 NW2d 171 (2011); *People v Lemons*, 299 Mich App 541, 545; 830 NW2d 794 (2013).

---

[5] Before trial, counsel for Miller raised an issue pertaining to a possible challenge to evidence obtained from the Cruse residence and the need for a suppression hearing.  Based on the oral argument presented, the trial court denied Miller's contention regarding the illegality of the search and seizure of evidence.  The trial court did, however, leave the door open for counsel to bring a suppression motion "if you think you get something regarding the suppression issue."  The lower court record fails to demonstrate that any of the counsel for defendants took advantage of this option.

Pursuant to the exigent circumstances exception . . . the police may enter a dwelling without a warrant if the officers possess probable cause to believe that a crime was recently committed on the premises, and probable cause to believe that the premises contain evidence or perpetrators of the suspected crime. The police must further establish the existence of an actual emergency on the basis of specific and objective facts indicating that immediate action is necessary to (1) prevent the imminent destruction of evidence, (2) protect the police officers or others, or (3) prevent the escape of a suspect. If the police discover evidence of a crime following the entry without a warrant, that evidence may be admissible. [*In re Forfeiture of $176,598*, 443 Mich 261, 271; 505 NW2d 201 (1993) (citation omitted).]

Based on testimony elicited at trial, Detroit police officer Brian Headapohl and his partner, Eric Smigielski, went to the Cruse Street address following a telephone call to the police. Both officers were in uniform and arrived in a marked patrol vehicle. They met with a woman outside the residence, presumed to have telephoned the police. Upon approaching the residence, numerous spent rifle casings were observed littering the ground. The storm door and side door to the residence were propped open and suspected blood was observed on the inner door; there was also an odor of bleach. Headapohl asserts that he knocked and announced his presence as a police officer several times without receiving a response from the interior of the home. The officers initially went into the basement of the home, which was open and accessible, and observed additional drops of blood on the stairwell. After assuring that the basement was clear, the officers returned to the upstairs and again knocked and announced their presence. When no response was elicited, Headapohl initiated several kicks to the bottom of the door to gain entry. When the door split, a hand emerged from the interior of the home, holding a .357 caliber weapon. Headapohl again announced his status as a police officer and withdrew to the exterior of the home and the individual holding the handgun retracted his hand back into the home. Officers then observed Loree Williams exiting the front door of the home, detained Loree and conducted a protective sweep of the premises.

Officers were dispatched to the home premised on a telephone call from an individual, suggesting suspicious activity or a concern for the residents of the home. Upon arrival, police observed numerous discharged rifle cartridges around the home, an open door, suspected blood, an odor of bleach and a lack of response from anyone within the premises. Based on the telephone call that initiated their arrival at the home, coupled with their observation of the physical conditions, the officers were justified in seeking entry to the home without a warrant based on the exigent circumstances exception, having "probable cause to believe that a crime was recently committed on the premises, and probable cause to believe that the premises contain evidence or perpetrators of the suspected crime." *Id*. As they were securing access to the premises, officers were confronted with a weapon and a possible threat to their safety or the safety of others in the neighborhood, which served as further justification to continue to seek entry into the premises.

The circumstances also render the emergency aid exception applicable. The emergency aid exception permits the police to enter an area without a warrant "under circumstances where they believe some person is in need of assistance or to prevent serious harm to someone."

*People v Davis*, 442 Mich 1, 12; 497 NW2d 910 (1993). In accordance with the emergency aid exception,

> police may enter a dwelling without a warrant when they reasonably believe that a person within is in need of immediate aid. They must possess specific and articulable facts that lead them to this conclusion. In addition, the entry must be limited to the justification therefore, and the officer may not do more than is reasonably necessary to determine whether a person is in need of assistance, and to provide that assistance. [*Id*. at 25-26 (footnotes omitted).]

This exception does not necessitate that officers have "ironclad proof of a likely serious, life-threatening injury;" it "requires only an objectively reasonable basis for believing that a person within [the house] is in need of immediate aid." *Michigan v Fisher*, 558 US 45, 47, 49; 130 S Ct 546; 175 L Ed 2d 410 (2009) (citations and quotation marks omitted). The numerous discharged rifle cartridges, suspected blood, bleach odor and failure to obtain a response from the interior of the home after repeated knocking and announcement of their presence made it reasonable for officers to seek to gain entry under the emergency aid exception.

On appeal, Williams suggests that officers failed to announce their presence and identify themselves before seeking to gain entry to the home. This suggestion is without support in the lower court record. First, Williams was not present at the home when officers tried to gain entry and, therefore, lacked personal knowledge regarding their behavior. Second, at trial it was never raised or asserted that the police officers did not knock and announce their presence or try to gain the attention of anyone within the home. Finally, Williams's assertion is directly contradicted by the testimony of Headapohl elicited at trial, wherein he averred that he knocked loudly numerous times on two separate occasions (before entry into the basement and after inspection of the basement) and verbally announced his presence as a police officer. There was no evidence or testimony submitted by Williams, or any of his codefendants, that was contrary to this testimony.

More importantly, Williams ignores that the officers did not enter into the upper level of the home or seize any evidence until after they had been confronted by an individual brandishing a weapon at them. While the individual withdrew the weapon upon realization that police were trying to gain entry into the home, this person did not then unlock the door for police but rather attempted to flee the scene wearing just underclothes. It was the detention of Loree Williams while leaving the premises and only partially clothed that led the officers to enter the upstairs of the home and conduct a protective sweep. The protective sweep was necessary because the officers had already been threatened with a weapon, which had to be in the residence because Loree exited the home unarmed. It was during this protective sweep that officers observed and seized weapons, ammunition and narcotics. "The Fourth Amendment allows a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v Buie*, 494 US 325, 337; 110 S Ct 1093; 108 L Ed 2d 276 (1990); *People v Cartwright*, 454 Mich 550, 556-557; 563 NW2d 208 (1997); *People v Snider*, 239 Mich App 393, 411; 608 NW2d 502 (2000); *People v Shaw*, 188 Mich App 520, 524-525; 470 NW2d 90 (1991). "Such a search is quick and limited, and conducted for the sole purpose of ensuring the safety of police officers and other persons." *Cartwright*, 454 Mich at 557. From the perspective of the officers, *id*. at 559, the protective

search of the residence was reasonable under the circumstances. The officers needed to ascertain whether anyone else was present in the residence and were aware that a weapon was located within based on the initial confrontation with the individual detained. It was appropriate to determine that no one else was in danger or could present a threat to the officers. While in the home, weapons, ammunition and narcotics were observed in plain view and could be properly seized. *People v Champion*, 452 Mich 92, 101-102; 549 NW2d 849 (1996).

## XII. SUFFICIENCY OF THE EVIDENCE

Miller argues that the evidence was insufficient to sustain any of his convictions. Miller challenges his convictions, but is vague and non-specific, other than to question the credibility of the two eyewitnesses, Griggs and Lewis. Although Miller generally asserts that the prosecution failed to meet its burden with regard to proof of each element of the crimes charged, he does not identify which elements lacked sufficient proof. Miller fails to adequately develop his argument by providing citations to the evidence or expounding on the elements that were not proven. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *People v Martin*, 271 Mich App 280, 315; 721 NW2d 815 (2006), aff'd 482 Mich 851 (2008) (citation and quotation marks omitted). Despite this deficiency, we will address each conviction.

A claim regarding the sufficiency of the evidence is reviewed de novo. See *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001). As discussed in this Court's recent opinion of *People v Bosca*, 310 Mich App 1, 5; NW2d ___ (2015):

> In determining whether the prosecutor has presented sufficient evidence to sustain a conviction, an appellate court is required to take the evidence in the light most favorable to the prosecutor. [T]he question on appeal is whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt. All conflicts in the evidence must be resolved in favor of the prosecution and we will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses. Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime. [B]ecause it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented. To evaluate the sufficiency of the evidence, it is necessary to review the evidence in the context of the elements of the charged crimes. [Citations and quotation marks omitted.]

A challenge to the trial court's decision on a motion for a directed verdict has the same standard of review as a challenge to the sufficiency of the evidence. See *People v Aldrich*, 246 Mich App 101, 122; 631 NW2d 67 (2001). However, only the evidence presented before the motion for a directed verdict was made is considered. *People v Hampton*, 407 Mich 354, 368; 285 NW2d 284 (1979).

Miller was convicted of both second-degree murder, MCL 750.317, and felony murder "based on torture," MCL 750.316(1)(b), with regard to Bostick. As noted in conjunction with Issue X, it is appropriate to affirm the conviction of the higher charge and to vacate the lower conviction. The elements of felony murder are: "(1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [MCL 750.316(1)(b) . . . ]," *People v Smith*, 478 Mich 292, 318-319; 733 NW2d 351 (2007), which include torture, MCL 750.85. Torture occurs when "[a] person . . ., with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control . . . ." MCL 750.85(1). The term "cruel" is defined as "brutal, inhuman, sadistic, or that which torments." MCL 750.85(2)(a). "Severe mental pain or suffering" is defined to include:

> [A] mental injury that results in a substantial alteration of mental functioning that is manifested in a visibly demonstrable manner caused by or resulting from any of the following:
>
> > (*i*) The intentional infliction or threatened infliction of great bodily injury.
> >
> > (*ii*) The administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt the senses or the personality.
> >
> > (*iii*) The threat of imminent death.
> >
> > (*iv*) The threat that another person will imminently be subjected to death, great bodily injury, or the administration or application of mind-altering substances or other procedures calculated to disrupt the senses or personality. [MCL 750.85(2)(d).]

Proof that a victim suffered pain is not required. MCL 750.85(3).

Miller was charged as an aider and abettor, with the prosecutor's theory being that Williams was the principal. "To prove felony murder on an aiding and abetting theory, the prosecution must show that the defendant (1) performed acts or gave encouragement that assisted the commission of the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of the predicate felony." *People v Riley (After Remand)*, 468 Mich 135, 140; 659 NW2d 611 (2003).

> In order to satisfy the malice standard required . . ., the prosecution must show that the aider and abettor either intended to kill, intended to cause great bodily harm, or wantonly and willfully disregarded the likelihood that the natural tendency of his behavior was to cause death or great bodily harm. Further, if an aider and abettor participates in a crime with knowledge of the principal's intent

-31-

to kill or to cause great bodily harm, the aider and abettor is acting with 'wanton and willful disregard' sufficient to support a finding of malice. [*Id.*]

Sufficient evidence was adduced to convict Miller of felony murder premised on the felony of torture and under an aiding and abetting theory. Miller was armed with an assault rifle and followed instructions provided by Williams to threaten and assault Lewis and Bostick. Bostick was made to strip and get on the floor while being threatened with weapons held by Miller and his codefendants. Payne and Griggs struck Lewis and Bostick with fists and guns in response to an instruction from Williams. Bostick was alleged to have verbally indicated an awareness that Miller and his codefendants were going to kill them. The evidence admitted regarding the treatment of Bostick before he was killed demonstrates that he was subjected to cruel behavior intended to induce fear, MCL 750.85(2)(a), (d), meeting the severe mental pain or suffering requirement for torture under MCL 750.85(2)(d)(*iii*) and substantiating Miller's participation and facilitation of the acts of his principal, Williams. In addition, Griggs testified that Williams verbally expressed an intent to kill someone before Lewis arrived at the residence, indicating that Miller would be aware of the principal's intent. Given the totality of the circumstances and Miller's participation in the events leading up to the murders, coupled with the efforts to remove the bodies and conceal their identities, there was sufficient evidence to convict Miller as an aider and abettor of the felony murder of Bostick.

Miller was also convicted of the second-degree murder of Jordan. "The elements of second-degree murder consist of (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. The term malice has been defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Henderson*, 306 Mich App 1, 9-10; 854 NW2d 234 (2014) (citation and quotation marks omitted). Jordan died as a result of a single gunshot wound to the head. Her body was so severely burned post-mortem that the medical examiner could only verify her identity through dental records. "[I]f an aider and abettor participates in a crime with knowledge of his principal's intent to kill or to cause great bodily harm, he is acting with 'wanton disregard' sufficient to support a finding of malice. . . ." *People v Kelly*, 423 Mich 261, 278-279; 378 NW2d 365 (1985). Miller was armed during the events and followed the instructions of Williams to threaten Jordan and the other victims. Griggs testified that Williams had expressed an intent to kill someone earlier in the day before the arrival of Lewis, Bostick and Jordan. Miller facilitated not only the murder of Jordan but also the attempt to conceal the murder by helping to burn the victim beyond recognition. Miller was observed assisting with the removal of one of the bodies from the Cruse Street residence and placing it in the trunk of the car rented by Lewis. Miller also drove to a gas station to procure the accelerant presumably used in igniting the vehicle and bodies. Sufficient evidence was adduced to sustain Miller's second-degree murder conviction of Jordan.

Miller was convicted of three counts of torture involving Bostick, Jordan and Lewis. Testimony and evidence were presented at trial to show that Miller was involved in threatening the three victims with an assault rifle and engaging in physical assaults on Bostick and Lewis. The actions taken by Miller and his codefendants were sufficient to comprise the "severe mental pain or suffering" necessary for a conviction of torture given the infliction of injury on Bostick and Lewis, MCL 750.85(2)(d)(*i*), and the "threat of imminent death," MCL 750.85(2)(d)(*iii*), as

recognized and expressed by Bostick as the events unfolded. "Custody or physical control" is defined as "the forcible restriction of a person's movements or forcible confinement of the person so as to interfere with that person's liberty, without that person's consent or without lawful authority." MCL 750.85(2)(b). The use of weapons to intimidate and control the victims is sufficient to constitute a "forcible restriction" or "confinement" element of torture. Finally, testimony indicated that Williams expressed an intent earlier in the day to kill someone and the actions and directives of Williams, executed with the complicity of Miller and his codefendants, were sufficient to demonstrate the requisite intent for the crime of torture under an aiding and abetting theory.

Miller was also convicted of three counts of unlawful imprisonment. In accordance with

MCL 750.349b(1):

> A person commits the crime of unlawful imprisonment if he or she knowingly restrains another person under any of the following circumstances:
>
> (a) The person is restrained by means of a weapon or dangerous instrument.
>
> (b) The restrained person was secretly confined.
>
> (c) The person was restrained to facilitate the commission of another felony or to facilitate flight after commission of another felony.

Testimony was elicited that Miller had an automatic rifle that he used to threaten and subdue the three victims both in the upstairs level of the home and within the basement. As such, sufficient evidence was adduced to sustain his three convictions for unlawful imprisonment under MCL 750.349b(1)(a), for each of the identified victims.

Miller was convicted of two counts of mutilation of a dead body involving the burning of the bodies of Bostick and Jordan. MCL 750.160 provides, in relevant part:

> A person, not being lawfully authorized so to do, who shall wilfully dig up, disinter, remove, or convey away a human body, or the remains thereof, from the place where the body may be interred or deposited, or who shall knowingly aid in such disinterment, removal, or conveying away, or who shall mutilate, deface, remove, or carry away a portion of the dead body of a person, whether in his charge for burial or otherwise, whenever the mutilation, defacement, removal, or carrying away is not necessary in any proper operation in embalming the body or for the purpose of a postmortem examination, *and every person accessory thereto, either before or after the fact*, shall be guilty of a felony, punishable by imprisonment for not more than 10 years, or by fine of not more than $5,000.00. [Emphasis added.]

Defendants stipulated at trial that the burning of bodies constituted mutilation, and undisputed evidence was admitted showing that Jordan's body was burned beyond recognition and that the

body of Bostick also suffered serious damage from thermal injury, having both been contained in a vehicle that was the subject of arson.

In accordance with an aiding and abetting theory, MCL 767.39 provides: "Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense." Although "[m]ere presence, even with knowledge that an offense is about to be committed, is not enough to make one an aider or abettor," *People v Rockwell*, 188 Mich App 405, 412; 470 NW2d 673 (1991) (citation and quotation marks omitted), " '[a]iding and abetting' describes all forms of assistance rendered to the perpetrator of a crime and comprehends all words or deeds that might support, encourage, or incite the commission of a crime,' " *Carines*, 460 Mich at 757 (citation omitted). Miller drove his vehicle to the gas station at the behest of Williams to procure gasoline in a gas can. Intent "may be inferred from all the facts and circumstances. Factors that may be considered include a close association between the defendant and the principal, the defendant's participation in planning or executing the crime, and evidence of flight after the crime." *Id*. at 758. Given Miller's participation in transporting Lewis, wrapped in a sheet, to the trunk of the Taurus, along with his procurement of the accelerant used to set fire to the vehicle with the bodies contained therein, sufficient evidence was admitted to sustain Miller's convictions on the two counts of mutilation of a dead body.

Miller was also convicted of felon in possession of a firearm, MCL 750.224f, and felony-firearm, MCL 750.227b. To establish the crime of felon in possession of a firearm, it must be shown that: (a) Miller was in the possession of a firearm, (b) when he was ineligible to do so due to a conviction of a felony, and (c) the requirements for regaining his eligibility to possess a firearm had not been met. MCL 750.224f. At trial, a stipulation was entered acknowledging that Miller had a previous felony conviction and was ineligible to possess a weapon on April 29, 2012. While conflicting evidence was admitted involving a statement from Eatmon, testimony was elicited from Lewis and Griggs that Miller was in possession of an assault rifle during the events that transpired at the Cruse Street residence. As such, sufficient evidence existed to sustain his conviction for felon in possession of a firearm.

Finally, Miller was convicted of felony-firearm, MCL 750.227b, which requires the possession of a firearm during the commission of or attempted commission of a felony. A charge of felon in possession of a firearm, MCL 750.224f, can constitute the underlying felony for felony-firearm. *People v Calloway*, 469 Mich 448, 452; 671 NW2d 733 (2003). Sufficient evidence was adduced to sustain this conviction premised on the testimony that Miller had an assault rifle during the events while committing many felonies, including felon in possession of a firearm.

Miller specifically contends that the testimony of Griggs and Lewis was inherently incredible and, therefore, insufficient to sustain his convictions of the crimes. This Court, however, will not interfere with the role of the trier of fact to determine the weight of the evidence or the credibility of the witnesses presented. *People v Eisen*, 296 Mich App 326, 331; 820 NW2d 229 (2012). Even further, this Court must defer to the trier of fact's credibility determinations "unless it can be said that directly contradictory testimony was so far impeached that it was deprived of all probative value or that the [trier of fact] could not believe it, or

-34-

contradicted indisputable physical facts or defied physical realities. . . ." *People v Lemmon*, 456 Mich 625, 645-646, 647; 576 NW2d 129 (1998) (citation and quotation marks omitted). While certain discrepancies existed in the testimony elicited, the testimony of Lewis and Griggs was consistent regarding the major elements and events of the crimes charged. The testimony elicited was not so inconsistent or impeached that it lacked any probative value. As such, this Court must defer to the trial court's determination of credibility.

## XIII. CONCLUSION

In Docket No. 320320, we affirm the convictions and sentences of Seabrooks. In Docket No. 320327, we vacate Payne's second-degree murder conviction and sentence with regard to Bostick. We remand to the trial court to amend Payne's judgment of sentence to reflect one conviction and sentence for first-degree murder under two theories for Jordan. We affirm the remainder of Payne's convictions and sentences. In Docket No. 320406, we vacate the sentence and conviction for second-degree murder for Williams with regard to the killing of Jordan. We remand to the trial court to amend Williams's judgment of sentence to reflect one conviction for felony murder under two theories for Bostick. We affirm the remaining convictions and sentences. In Docket No. 320502, we vacate Miller's conviction of second-degree murder with regard to Bostick, affirm the remaining convictions and sentences, and remand to the trial court for amendment of the judgment of sentence. We do not retain jurisdiction.

/s/ Joel P. Hoekstra
/s/ Kathleen Jansen
/s/ Patrick M. Meter

-35-